No. 87-379

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

IN RE THE MATTER OF
C.G., Youth in Need of Care.

---

APPEAL FROM:  District Court of the Thirteenth Judicial District,
              In and for the County of Yellowstone,
              The Honorable G. Todd Baugh, District Judge.

COUNSEL OF RECORD:

      For Appellant:

            Harris & Seidler; Nancy Seidler, Billings, Montana

      For Respondent:

            Greg S. Mullowney, Deputy County Attorney, Billings,
            Montana
            Olsen, Christensen & Gannett; Damon Gannett, Billings,
            Montana
            Sally M. Johnson, Billings, Montana

---

                          Submitted on Briefs:  Dec. 17, 1987

                          Decided:  January 14, 1988

Filed:  JAN 1 4 1988

                          *Ethel M. Harrison*
                    _____
                              Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

This is an appeal of findings of fact, conclusions of law and order entered April 15, 1987 and judgment filed April 16, 1987, by the District Court of the Thirteenth Judicial District, Yellowstone County. The District Court granted to the Montana Department of Social and Rehabilitation Services (SRS) temporary custody of C.G. until she reaches the age of eighteen. C.G.'s natural father, D.G., (father) appeals.

We affirm.

The only issue is whether the District Court erred in granting temporary custody to the SRS.

The appellant in this case, the natural father of the child, argues the District Court erred by applying only the "abuse and neglect" portion of § 41-3-609, MCA, for termination of parental rights. He contends that there was not clear and convincing evidence to support the District Court's decision. However, the District Court's order clearly shows that there was not a "termination" of parental rights, only a granting of temporary custody to SRS until C.G. reaches the age of eighteen. The District Court stated:

> It is not in the best interests of [C.G.]
> that she not see her parents while in the
> State's custody. It is strongly
> recommended by this Court that [C.G.] be
> placed in a long-term private foster home
> . . . and be allowed regular contact with
> both [her mother and father].

We note at the outset that the mother of C.G. does not appeal the decision of the District Court, therefore, evidence presented as to her conduct is not directly relevant to our determination. Nonetheless, this evidence will be considered in our ascertainment of the best interests of the child.

2

The mother and father of C.G. were never married and informally lived together from 1976 until 1981. C.G. was born March 13, 1979. Both parents have had alcohol and/or substance abuse problems. As a result, C.G. and her half-brother, R.B., the mother's son from a previous marriage, have spent significant amounts of time in foster care or with local community service organizations. A detailed history of the children's home environment, drafted by Majel Bird (Bird), a social worker for the Yellowstone County Human Services, shows that the children were often left alone for long periods of time and C.G.'s brother was forced to accept many of the parental responsibilities. After C.G.'s father left in 1981, he maintained only minimal contact with the children and provided no support.

C.G.'s father has since remarried and moved to Hayward, California. At the time of the hearing on termination of parental rights, the father was receiving workers' compensation payments as a result of an injury suffered on a job in California. A court-approved written treatment plan was entered into by C.G.'s father from April 15, 1983 to July 15, 1983. This plan required the father to attend parental classes, visit C.G. weekly, secure clean, appropriate housing, attempt to procure employment, complete a psychological evaluation and follow any recommendations, and obtain and follow a chemical dependency counselor's recommendations. Not one of these requirements was ever met.

Testimony was presented that C.G.'s father never kept appointments, did not get involved in employment training programs, nor did he seek or receive any psychological or chemical dependency assistance. He testified that he did not attend parenting classes. C.G.'s father stated "I just didn't feel right for someone to tell me how to raise my daughter." Additionally, C.G.'s father did not make contact

with the social worker assigned to his case from December of 1985 to September of 1986, only days prior to the District Court hearing. During this period of time, he also had only limited contact with C.G. in the form of a number of cards and alleged telephone calls.

C.G.'s mother has a history of mental illness and was judicially committed in 1981. The mother suffers from severe depression and an exorbitant alcohol problem. Between 1981 and 1986, C.G.'s mother suffered a number of relapses of both mental problems and alcohol abuse which resulted in neglect and abuse of C.G. and her brother. The two children were placed in a foster home numerous times, which was documented by the report filed by Bird. Four separate court-approved written treatment plans designed to assist the mother by stabilizing her emotional life, improving parenting skills, establishing a concrete home environment, and limiting her dependency on alcohol and drugs, were signed by the mother yet never completed.

Testimony presented at the District Court hearings held September 15, 24 and 26, 1986, showed that C.G.'s father had custody of C.G. only a couple of weeks after his separation with the mother in 1981. The father also testified that his current wife had been arrested for prostitution and there was testimony that C.G. did not wish to spend nights with her father and new spouse because she was sent to her room while they "did business."

The conclusions of law of the April 15, 1987 District Court order stated:

> [C.G.] is an abused or neglected child within the meaning of Section 41-3-102, MCA, and is a youth in need of care. Her normal physical and mental health or welfare is threatened with harm by the acts and omissions of [her father and mother]. Both parents have been unable

4

> to provide a safe, appropriate, home
> environment for this child.
>
> It is in [C.G.]'s best interests that she
> be taken from the custody of [her mother
> and father], and that her temporary care,
> custody, and control be awarded to [SRS]
> until she reaches the age of 18 years.

Counsel for C.G.'s father argues that the District Court erred "[i]n applying Section 41-3-609, M.C.A., 1987, 'abuse and neglect' standards for termination of parental rights."

This argument is inaccurate and appellant's claim does not address any issue of error by the District Court. It is clear from a reading of the District Court's order that no termination of parental rights occurred. Therefore, the formal process outlined in § 41-3-609, MCA, which defines guidelines and criteria for termination of the legal child-parent relationship, need not be addressed. The Guardian Ad Litem appointed for C.G. advocates affirmance of the order of the District Court and filed a supporting brief. The modification of the parental rights of C.G.'s mother and father clearly does not terminate the parent-child legal relationship and therefore any argument regarding termination is superfluous.

The District Court set forth the powers that SRS would have over C.G. allowing that agency to find appropriate long-term private foster care. This will give the child stability and a favorable home environment and still allow interaction between the parents and C.G.

The order does not disallow the parents of C.G. from gaining custody of the child in the future, contingent upon proper compliance with a service treatment agreement which has so far proved unsuccessful.

The policy of this state is to ensure the family unit and that interest is constitutionally guaranteed. Section

5

41-3-101(1)(d), MCA; Matter of J.L.B. (1979), 182 Mont. 100, 109, 594 P.2d 1127, 1132. However, the right to maintain the family unit is not absolute and although the children's best interests and welfare generally are served by maintaining the family unit with custody retained by the natural parents, "[t]he children's best interest and welfare, not that of the natural [parent], is the paramount consideration." In Re Gore (1977), 174 Mont. 321, 328, 570 P.2d 1110, 1114. The District Court properly determined the best interest of C.G. would be served by temporary custody granted to SRS.

We have stated:

> [T]his Court is mindful that the primary duty of deciding the proper custody of children is the task of the district court. As a result, all reasonable presumptions as to the correctness of the determination by the district court will be made. Foss v. Leifer, 170 Mont. 97, 550 P.2d 1309, 33 St.Rep. 528 (1976). Due to this presumption of correctness, the district court's findings will not be disturbed unless there is a mistake of law or a finding of fact not supported by credible evidence that would amount to a clear abuse of discretion.

Matter of C.A.R. (Mont. 1984), 693 P.2d 1214, 1218, 41 St.Rep. 2395, 2398-2399.

There was credible evidence that C.G. was a youth in need of care and is an abused and neglected child pursuant to § 41-3-102(2), MCA, which states: "'[a]bused or neglected child' means a child whose normal physical or mental health or welfare is harmed or threatened with harm by the acts or omissions of his parent . . . " Harm to a child's health or welfare is defined in subsection (3) of § 41-3-102, MCA. Either subsection (3)(c), which deals with failure to supply an adequate home environment or subsection (3)(d), dealing

6

with abandonment for a period of six months, would apply in this case.

The findings of fact and conclusions of law are supported by the evidence and testimony and the District Court did not err in determining the best interest of C.G. would be served by temporary custody being granted to SRS.

We affirm.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices