DA 09-0483

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 42

IN THE MATTER OF:

A.J.W.,

       A Youth in Need of Care.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DN 08-001C
Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Joslyn Hunt, Chief Appellate Defender; Lisa S. Korchinski,
Assistant Appellate Defender, Helena, Montana (for Father)

              Joseph P. Howard; Attorney at Law, Great Falls, Montana
(for Mother)

       For Appellee:

              Hon. Steve Bullock, Montana Attorney General; Mark W. Mattioli,
Assistant Attorney General, Helena, Montana

              Kimberly P. Dudik, Assistant Attorney General, Child Protection Unit,
Missoula, Montana

                  Submitted on Briefs:  January 27, 2010

                        Decided:  March 2, 2010

Filed:

           _____
                       Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    M.W. and E.J. are the birth parents of A.J.W.  They each separately appeal from the District Court's Findings of Fact, Conclusions of Law and Order Terminating Parental Rights filed July 30, 2009.

¶2    The father M.W. contends on appeal that he received ineffective assistance of counsel in the District Court and requests that this Court reverse the Order Terminating Parental Rights and "appoint effective counsel" to represent him.  The mother E.J. contends generally that the District Court erred in terminating her parental rights and requests that the Order Terminating Parental Rights be reversed.  We affirm.

## BACKGROUND

¶3    In October, 2006, when she was two, A.J.W. was removed from her home and placed in foster care because of her parents' alcoholism and family violence, and because both had been arrested.  After the mother E.J. received alcohol counseling, A.J.W. was returned to her parents in March, 2007.  After this time the parents failed to address A.J.W.'s health and developmental needs, including her need for speech therapy, her need to fix a broken tooth, and follow-up care for a broken leg.  She received no medical attention for her failure to gain weight.

¶4    In December, 2007 A.J.W. was removed a second time and placed in foster care after both parents were again incarcerated.  The mother E.J. was in custody charged with felony assault with a weapon against the father M.W.  She was released in January, 2008, and the charges were later dismissed when M.W. recanted his allegations.  M.W. was

arrested and incarcerated for failure to register as a sex offender based upon a prior conviction in Texas. He was subsequently released, pled guilty, and received a three-year suspended sentence.

¶5 In January, 2008, both parents stipulated to adjudication of A.J.W. as a youth in need of care, and to a grant of temporary legal custody to the State. A.J.W. was diagnosed with developmental deficiencies including failure to thrive, a speech deficit resulting from "pure communication neglect" in the home, and fetal alcohol effect. She has also been diagnosed with reactive attachment disorder and post-traumatic stress disorder. These conditions arose from her exposure to the violent and volatile relationship between her parents, from their substance abuse, and from their general failure to care for and nurture her. In February, 2008 the District Court approved a treatment plan for each parent with the ultimate goal of family re-unification. A.J.W. remained in foster care.

¶6 E.J. did not complete her treatment plan. While she completed some of the steps, she had substantial problems completing others. She dropped out of group therapy and went to AA meetings as a substitute. She failed to obtain an AA sponsor and failed to provide documentation that she attended AA meetings. She complied with urine testing requirements for a period of time, but then submitted two specimens that indicated that she had attempted to "flush" her system to dilute the results. After that she failed to provide specimens. In July, 2008, she was involved in a road rage incident with another driver, and an accident with a vehicle pulling a boat. As a result of that incident she was

3

charged with three counts of felony criminal endangerment, felony theft, felony criminal mischief and misdemeanor DUI. Her blood alcohol content at the time was .221.

¶7 E.J. pled guilty to criminal endangerment and criminal mischief, both felonies, and to misdemeanor DUI. She was sentenced to the Department of Corrections for a term of ten years with five suspended. She was still in custody for these charges when the District Court issued the order appealed from in July, 2009. The District Court found that E.J.'s history of alcohol abuse and anger issues "make her a high risk to, at a minimum, violate the conditions of parole and any reunification with A.J.W. would be uncertain at best."

¶8 M.W. was also unable to complete his treatment plan. He is required to register as a sex offender because of a prior felony conviction for a sex offense in Texas. This conviction makes him ineligible for public housing, and securing adequate housing for his daughter was a condition of his plan. While he was making some progress in therapy, especially with his anger issues, he was arrested in November, 2008 and charged with two counts of felony distribution of dangerous drugs arising from incidents that occurred in June and July, 2008. In April, 2009 he pled guilty to one of the counts and was sentenced to a term of six years, with three suspended, but with no eligibility for parole during the three years of incarceration. He later claimed that he sold drugs to raise money to pay for adequate housing required by his treatment plan. He was also still incarcerated at the time of the District Court's order.

¶9 On July 27-28, 2009, the District Court held a hearing on the State's petition to terminate the parental rights of M.W. and E.J. At the time of the hearing A.J.W. had

4

been in foster care since December, 2007 and had been placed with relatives of E.J. in California who were interested in adoption.

¶10 The District Court's Findings of Fact, Conclusions of Law and Order Terminating Parental Rights recounted the history summarized above. The District Court found:

> Primarily because of their inability to remain law abiding and their present incarceration but also considering the violent nature of their relationship and that neither parent successfully completed their court approved treatment plan, the court finds that both are unlikely to change within a reasonable time. A.J.W. has as of the date of this Order been in the custody of the Department for 19 months and currently is in a stable placement with members of E.J.'s extended family in the State of California.

The District Court concluded that the parents' conduct that rendered them unfit was unlikely to change within a reasonable time, that the State had made reasonable efforts to reunite the family, and that the best interests of A.J.W. would be served by terminating the parental rights of both parents.

## STANDARD OF REVIEW

¶11 A court may order the termination of parental rights upon a finding supported by clear and convincing evidence that the child is a youth in need of care. Section 41-3-609(1), MCA. The court must find that the parents' conduct is unlikely to change in a reasonable time, considering a list of factors, the primary one of which is the "physical, mental and emotional condition and needs of the child." Section 41-3-609(3), MCA; *In the Matter of C.J.K.*, 2005 MT 67 ¶ 14, 326 Mont. 289, 109 P.3d 232.

¶12 This Court reviews a district court's order terminating parental rights for abuse of discretion. *In the Matter of J.V.*, 2003 MT 68, ¶ 7, 314 Mont. 487, 67 P.3d 242. A court abuses discretion when it acts arbitrarily, without employment of conscientious judgment

5

or in excess of the bounds of reason, resulting in substantial injustice. *Matter of C.J.K.*, ¶ 13. Findings of fact are reviewed under the clearly erroneous standard, and conclusions of law are reviewed to determine whether they are correct. *Id.*

¶13 This Court exercises plenary review of whether a parent was denied effective assistance of counsel in termination proceedings. *In the Matter of A.S.*, 2004 MT 62, ¶ 9, 320 Mont. 268, 87 P.3d 408.

### DISCUSSION

¶14 Issue One: Did the District Court properly terminate the parental rights of E.J.? E.J. contends that the District Court relied on insufficient evidence and did not require the State to meet its burden of proof in the termination proceeding.

¶15 A parent's right to the care and custody of her child is a fundamental liberty interest which must be protected by fundamentally fair proceedings. *Matter of A.S.*, ¶ 12. Accordingly, a court may terminate the parent-child legal relationship upon clear and convincing evidence that:

> (f) the child is an adjudicated youth in need of care and both of the following exist:
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

Section 41-3-609(1)(f), MCA. Clear and convincing evidence is

> simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be established by a preponderance of the evidence or by a clear preponderance of the proof. This requirement does not call for unanswerable or conclusive evidence. The quantity of proof, to be clear and convincing, is somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—

6

that is, it must be more than a mere preponderance but not beyond a reasonable doubt.

*In the Matter of E.K.*, 2001 MT 279, ¶ 32, 307 Mont. 328, 37 P.3d 690. The paramount concern is the health and safety of the child, *In the Matter of A.T.*, 2006 MT 35, ¶ 20, 331 Mont. 155, 130 P.3d 1249, and the district court must give "primary consideration to the physical, mental and emotional conditions and needs of the child." Section 41-3-609(3), MCA.

¶16 In this case, it is uncontested that both parents stipulated that A.J.W. be adjudicated a youth in need of care. It is also clear that E.J. never completed her treatment plan, having been arrested and incarcerated for several felony offenses before completing the plan. She also failed to follow her plan in other ways including failure to obtain counseling, failure to attend AA and failure to provide clear urine samples. The only issue, therefore, was whether E.J.'s conduct or condition that rendered her unfit was unlikely to change in a reasonable time. E.J. argues that the District Court's finding that she was unlikely to change within a reasonable time was clearly erroneous because it was not supported by substantial evidence.

¶17 To the contrary, there was substantial evidence that E.J. was unlikely to change her behaviors in a reasonable time. As the District Court found, the State had been involved in efforts to protect A.J.W. since 2006 when she was placed in foster care because of the severe alcohol abuse and violence in the home. E.J. was deeply involved in those behaviors. A.J.W. was back home from March to December, 2007, when she was finally removed because E.J. was arrested on a charge of stabbing M.W.

¶18 E.J. had substantial problems dealing with her anger and aggression, particularly toward M.W., to the extent that it led to termination of marriage counseling that was ordered as part of the treatment plan. She manipulated requirements of the treatment plan, including avoiding group therapy by committing to participate in AA and then not following through with that commitment. She tried to avoid the urine analysis requirement by trying to flush her system to mask results, and then stopped providing samples. She often threatened, intimidated and berated social workers who were attempting to work with her.

¶19 In July, 2008, in the midst of the treatment plan, E.J. instigated a serious incident in which she followed, tailgated, and then stopped another driver while screaming obscenities and making threats. She left that site and was involved in a wreck with a vehicle towing a boat. When arrested she had a blood alcohol content of .221, substantially in excess of the legal limit of .08. The result of the incidents was that she pled guilty to several offenses and was sentenced to a term of incarceration followed by supervised release. The District Court found that E.J.'s history of alcohol abuse and anger issues make her a high risk to violate conditions of parole and to return to prison.

¶20 Expert testimony at the hearing indicated that while E.J. had made some progress in treatment programs while incarcerated, those successes did not qualify as completion of the treatment plan, the point of which had been to stabilize E.J.'s life so that she could be reunited with A.J.W. To the contrary, E.J.'s compliance with her treatment plan had been a material failure. Treatment in a custodial setting, according to the expert testimony, is not an indicator of change and E.J. would need a substantial period of time

in a supervised community setting prior to any consideration of reunification with her daughter.

¶21     In summary, the evidence showed that E.J. lacked the ability to change her destructive behaviors for anything more than a short period of time. The road rage incident that led to her felony convictions indicates that her anger and alcoholism issues pervade her life, and are not just limited to her relationship with M.W.

¶22     The evidence showed that E.J. had substantial issues with alcohol addiction and anger; that she was manipulative and resistant to change and that her behaviors— including failure to provide the most basic care and nurturing to her daughter—had caused substantial damage. The District Court properly found, based upon the evidence, that E.J.'s behavior was not likely to change in a reasonable time.

¶23     Issue Two: Was M.W. denied the effective assistance of counsel? M.W. contends that his trial court attorney was ineffective for failing to move the District Court to order "long-term custody" for A.J.W. under § 41-3-445, MCA, or appointment of a guardian for her under § 41-3-444, MCA, as an alternative to termination of parental rights. M.W. asserts that there was "no plausible reason" for his attorney to not move for long-term custody and asserts that "it is likely the district court would have entertained such a plea." As to the guardianship alternative, M.W. notes that there are many difficult statutory conditions for such an appointment, and concedes that appointment of a guardian "may have been a long shot."

¶24     Parents have a due process right to the effective assistance of counsel in proceedings seeking to terminate parental rights. *Matter of A.S.*, ¶ 20. This Court has

9

suggested the attorney's training and experience and the quality of the attorney's advocacy as two non-exclusive factors for the evaluation of a claim of ineffective assistance of counsel in termination proceedings. Even if there were ineffective representation, it is inconsequential unless the parent suffered prejudice as a result. *Matter of A.S.*, ¶ 31.

¶25 M.W. does not make any argument that his attorney lacked the training and experience to adequately represent him and so we need not consider that point. The remaining arguments are all record based and can be sufficiently reviewed based upon the record on appeal.

¶26 As to the guardianship alternative, the statute relied upon by M.W., § 41-3-444, MCA, provides that the court may appoint a guardian "upon the petition of the department or guardian ad litem." The statute does not provide that the parent may petition for appointment of a guardian. Here both the State and the guardian ad litem for the children recommended termination of parental rights, and the State must consent to the appointment of a guardian. Section 41-3-444(2)(a), MCA. Since there was virtually no chance that a guardian would have been appointed for A.J.W. as an alternative to terminating M.W.'s parental rights, any failure to seek an appointment did not constitute ineffective assistance of counsel.

¶27 M.W.'s argument for long-term custody under § 41-3-445, MCA, is similarly tenuous. Section 41-3-445(8), MCA, lists "permanency options" that a district court may consider for the care of a neglected child. Those include reunification with a parent, modification of an existing custody order, adoption, appointment of a guardian under §

10

41-3-444, MCA, or long-term custody. M.W. makes no showing or argument that the District Court in this case was unaware of the permanency options listed in the statute. M.W. offers only speculation that long-term custody would have been ordered in this case if only a motion had been made by his attorney.

¶28 The record fully reflects the physical and emotional effects A.J.W. suffered from living in a household with M.W. and E.J. The child had been in foster care for about a year when the State petitioned for termination and for a year and a half when M.W. was sentenced to prison. She was recovering from the effects of her early years and forming a bond with the foster parents (extended relatives of E.J.) who desired to adopt her. Both M.W. and E.J. recognized the value of this placement for A.J.W. The professionals who had been working with the parents for an extended period of time with the goal of family re-unification unanimously recommended that the best interest of the child required termination of parental rights. In this setting, M.W.'s contention that he was deprived of the effective assistance of counsel is unsupportable.

¶29 The District Court's order terminating parental rights is affirmed.

/S/ MIKE McGRATH

We concur:

/S/ PATRICIA O. COTTER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

11

Justice James C. Nelson concurs.

¶30    I concur in the Court's Opinion.

¶31    I offer one additional observation that was raised in M.W.'s brief, but which we did not need to address in our Opinion. Appellate counsel raises a valid point regarding the training and experience of counsel representing a parent whose rights are the subject of a termination proceeding. Specifically, while our decision in *In re A.S.*, 2004 MT 62, ¶ 26, 320 Mont. 268, 87 P.3d 408, requires that trial counsel's effectiveness be evaluated based on training, experience and advocacy, trial counsel's actual training and experience is seldom, if ever, made a part of the record in the district court.

¶32    Accordingly, when ineffective assistance of counsel (IAC) claims are raised, appellate counsel is unable to offer any argument on trial counsel's training and experience without going outside the record. Similarly, this Court is in no position to evaluate those components of our *In re A.S.* test. While this Court is able to deal with the evidentiary aspects of IAC claims in criminal cases in post conviction proceedings under Title 46, chapter 21, MCA, no similar proceedings exist for the evaluation of IAC claims in parental rights termination cases.

¶33    Appellate counsel suggests that, in termination cases, trial counsel's training and experience should be made part of the record and that it is the trial court's duty to inquire about counsel's training and experience in termination cases. *See In re A.S.*, ¶ 27. I agree. Parents are entitled to effective assistance of counsel in termination cases; appellate counsel is entitled to raise such claims; and this Court is required to evaluate those claims based on a record properly preserved in the trial court. Since it is unlikely

12

that trial counsel is going to make his or her own training and experience a matter of record, it is the duty of the trial judge to make sure that information is made a part of the record.

¶34    With that observation, I otherwise concur in the Court's Opinion.


/S/ JAMES C. NELSON

13